ARTHUR LELAND v. ST. OLAF LUTHERAN CHURCH AND ANOTHER.[1]

May 5, 1944.

No. 33,749.

See 213 Minn. 34, 4 N. W. (2d) 769.

*Arthur LeSueur,* for relator.

*Reynolds & McLeod,* for respondents.

[1]Reported in 14 N. W. (2d) 340.

MAGNEY, JUSTICE.

*Certiorari* to review an order of the industrial commission which, after a rehearing, denied compensation to relator.

This case has been here before. Leland v. St. Olaf Lutheran Church, 213 Minn. 34, 4 N. W. (2d) 769, where this court concluded that a rehearing should be had and remanded the case to the industrial commission for that purpose. The rehearing has been had, and this court is now asked to review the order of the commission again denying compensation.

The main facts are set out in the first opinion, and it is not necessary to restate them. There are some modifications, to which attention will be called, which have a bearing on the decision here. The question involved in the first decision and also here is whether relator's disability is attributable to a fall on the front steps of respondent church on February 4, 1938. The commission for the second time has found that the fall was not the cause of relator's condition, and the correctness of that finding is challenged.

It is true that in matters of this kind we are not the triers of fact. Our function is to review and correct the proceedings in a cause instituted in a lower court or other tribunal. Anderson v. Farwell, Ozmun, Kirk & Co. 217 Minn. 110, 14 N. W. (2d) 311. However, in view of our former opinion, it may be well to reconsider the facts as they are now presented.

Four doctors were of the opinion that relator had sustained an injury to his lower spine. One of these was Dr. J. Grafton Love of the Mayo Clinic. Three others, who testified, were decidedly of the opposite view. In its former opinion, after commenting on the medical testimony, this court said (213 Minn. 38, 4 N. W. [2d] 771) :

"If we were to disregard the findings of Dr. Love, who operated on relator's back in March 1940, we should be compelled to hold that the conclusions of the commission were final, in view of the conflict in the opinions of the medical men as to the nature and extent of relator's injury. Rehak v. St. Paul T. W. Co. 206 Minn. 96, 288 N. W. 22; Ogrosky v. Commonwealth Elec. Co. 172 Minn. 46, 214 N. W. 765; Delich v. Thompson-Starret Co. 175 Minn. 612,

220 N. W. 408. But it seems to us that the commission failed to give due significance to the findings of Dr. Love. He may have been of the opinion that relator 'reacted untowardly to a relatively minor injury,' but he definitely found evidence of injury which he attributed to the accident."

On that basis, this court determined that a rehearing should be had. As to the medical testimony contained in the record on the rehearing, we reiterate what was said in our first opinion, namely, that, disregarding the testimony of Dr. Love, "we should be compelled to hold that the conclusions of the commission were final, in view of the conflict in the opinions of the medical men as to the nature and extent of relator's injury." It becomes necessary, therefore, to consider the testimony given by Dr. Love in a deposition read in evidence at the rehearing, as well as the records of the Mayo Clinic offered in connection with his testimony.

On March 2, 1940, Dr. Love operated on relator. The medical term for the operation he performed is "resection of the ligamenta flava." He found that the fourth and fifth ligamenta flava were abnormally thickened and fibrotic. This situation was corrected. There was no protrusion of lumbar disks. Dr. Love said he knew of no specific case in which the ligament is thickened and fibrosed other than those in which trauma is an etiological factor. He was of the opinion, however, that an infection or inflammation in the ligament might result in a thickening and fibrosis such as is seen in definite traumatic cases. Dr. Love stated: "The findings were not considered adequate to explain all the patient's symptoms." The operation was not performed with the expectation of relieving entirely the condition of which relator complained. Dr. Love further testified: "In addition to the patient's complaint of low back and sciatic pain, he had pains in other parts of the body which we did not feel could be ascribed to a diseased process at the lower end of the spine." He also stated: "Nevertheless, at the time of dismissal the patient complained of pain in the upper portion of the dorsal, thoracic and cervical region, and he still had some of his, what I would call functional color." On the surgical card, the

doctor made this notation after the operation: "The prognosis for relief is indeterminate. It did not seem likely that the findings at operation were sufficient to explain the patient's complaint." Dr. Love again saw relator on August 31, 1942. Relative to this examination, he states: "The patient presented a very bizarre picture to us at the time of his examination on August 31, 1942, and it was entirely impossible for us to evaluate his condition. Certainly he had the appearance of one totally disabled, but objective neurological findings were lacking." His appearance was then worse than at any time the doctor had seen him. He was asked: "At the time of your last examination, what was the plaintiff's history at that time to you?" He replied: "At the time of his return on August 31, 1942, his main complaint was pain in the back, with radiation to the legs. He stated that his back felt as if there were cinders in the back. He stated that he had pain even when in bed, with shots of pain into the legs down to the heels; worse in the left than the right, and made worse by coughing and bending. Also complained of pain in the left side of the neck and another pain in the left shoulder blade. He also complained of severe pain just above the operated site." These complaints were very similar to those relator made to Dr. Love prior to the operation. The doctor stated that the X-ray examination revealed a slight compression of the first lumbar vertebra. He was asked:

"Q. From your own observation of this man, Doctor, did you feel that there was any question of functional element in his case?

"A. Yes.

"Q. Was that more pronounced on your last examination than on your previous examination?

"A. Yes.

"Q. Did you notice on the occasion of your previous examination any indication of that same condition?

"A. Yes."

And further:

"Q. At the time of your last examination did you feel that this

man was then disabled as a consequence of any condition in his low back of the kind he was operated on for?

"A. No. * * *

"Q. From that examination you found no cause for his then claimed disability?

"A. No."

The records of the Mayo Clinic disclose that relator was examined in September 1933, and his ailment diagnosed as nerve exhaustion. One of the examining physicians made this notation on the records at that time: "Marked functional (neurogenic) features.—Hypertension." A consultant added this: "Sounds functional." In September 1937, he again appeared at the clinic. The records show that at that time he gave the following history: In the winter of 1932-1933, he was nervous, had studied too hard; developed aches and pains over entire left side of body; sharply lateralized from left headache, left sore throat, pains in left extremities, chest, and abdomen—right side free—"soreness, (to touch, jarring, etc.) marked, in epigastrium, difficulty in sleeping partly from nervousness, partly from epigastric soreness and indefinite pain. * * * Indefinite back pain at same time." He became better in the summer of 1933 until his mother's death in August, when symptoms came on with increasing severity—same soreness, same indefinite pain, same pain in back. In May 1933, he had severe pain in the epigastrium and severe pain in the back. In the latter part of June 1937, he returned to the clinic for another examination. His difficulty was then diagnosed as neurosis—"nervous and emotionally unstable." In March 1937, he had a marked emotional upset over a "personal matter" which caused him to have a nervous breakdown. He was hospitalized, and since then has been unable to be quiet and composed. In 1937, his ailment was diagnosed as "chronic nervous exhaustion, neurocirculatory asthenia, possible hypertensive heart disease, * * * compound hyperopic astigmatism, nerv. breakdown over pre-marit [marital] affair—other [otherwise] depressed. Believe wise to spend couple of mons. [months] as farm hand out on Father's ranch." On June 29, 1938, he was again

examined at the clinic. The examining doctor noted on the record: "Believe there is a large mental factor in this patient." His trouble was diagnosed as "hysterical aphonia." In July 1939, Dr. Henderson of the clinic made this notation: "Will need neurological—sounds largely functional."

On August 31, 1942, Dr. Moersch of the clinic examined relator and made this diagnosis: "He has that hang-dog medico-legal expression that is always difficult to interpret. Grunts & sighs & seemingly in much pain. Back rigid—has worse back since June 1940. Walks with much difficulty, etc. Has no good neurologic signs of progressive trouble. Dr. Love to see before added tests." To that statement, Dr. Love added after examination of relator: "As above & with emphasis. I have told pt. [patient] & his accompanying attorney, Mr. Arthur Le Sueur, that I could see no reason for doing a lot of examining & X-raying, etc. Since there is no history of progression & no evidence on neurologic exam. [examination] of progressive lesion."

Upon the above testimony and exhibits and all the other facts found in the record, the industrial commission came to the conclusion that the thickened and fibrotic condition of the ligamenta flava found by Dr. Love was not the cause of the symptoms of which relator complains. Relator's entire claim is based upon claimed definite organic injury caused by the accident on February 4, 1938. He has the symptoms of a neurotic, but all the medical witnesses rule out traumatic neurosis as an explanation of his difficulties. The Mayo Clinic records disclose that he suffered from neurosis as far back as 1932 or 1933.

On the evidence, the commission could well find that relator's condition is not connected with the accident of February 4, 1938; that his disability is of a neurological nature, without an organic basis. All of respondents' doctors claim that his condition is functional, and their testimony implies that he is a neurotic. The Mayo Clinic records alone may well be sufficient to justify the commission in concluding that relator was not suffering from any dis-

ability referable to or associated with the accident of February 4, 1938.

This case presents a pure question of fact. As such, the findings of the industrial commission are conclusive on this court if there is reasonable evidence to sustain them, and they will not be disturbed unless they are manifestly contrary to the evidence. O'Reilly v. Miller, 205 Minn. 228, 285 N. W. 526. As to the commission's finding rejecting relator's claim, we hold that it is amply supported by the evidence. Consequently the decision of the commission must be affirmed.

Writ discharged.